This next case up is 419-0476, Pratt v. Arch Daniel Midlands Company and The O'Hare Company, Inc. For the appellant is Devin Bruce.  I'm sorry? You are he. I am he. Okay. Thank you. And for the appellee is Francis Cetera. That's correct. Thank you. Is that pronounced correctly? It is pronounced correctly in this part of the world. Well, it should be Cetera. It should be Cetera in Italy and in the South, and we call it Cetera. Well, I'll be happy to use it. Cetera is what I should use? Cetera is what you should use. Okay. Thank you, counsel. Before beginning, I just want to mention that we always ask everyone to be here a half hour early in case we're able to start early. And here we are, able to start early. And I want to thank you all for doing that because it's a convenience for the court and also maybe for you folks. So with that – Justice Feigman, I'm sorry. I have to step out and get my reading glasses or I will not be very effective. Okay. So I'm sorry to do that. Thank you. Wow, that was fast. Right there for me. Okay. So, Mr. Bruce, you're ready to proceed, sir. I am. Thank you so much. May it please the court, my name is Devin Bruce. Yes, sir. And I represent the estate of Kenny Pratt and his widow, Mrs. Pratt. Frank, the counsel, I'd like to also introduce my co-counsel, Dennis Woodworth. Before I get started, Justice, I was just thinking about what you said about the timing in which we start all of these things. I went to the wrong courthouse the last time I argued before this court. It was shortly after I clerked for the Supreme Court and I had gone to the room over there. And so I went over there an hour early, so I guess barely made it here for 30 minutes early. So here I am. So, Justice, I know you're familiar with the issue of the case and what we're here for today. We have a tragedy in which I represent Mr. Pratt, who suffered horrific burn injuries and ultimately died. He was three weeks here in Springfield in Sangamon County, and then he passed away in Sangamon County. The occurrence obviously took place in Adams County, and we filed the action here in Sangamon County. Because of the connections that we felt were prevalent here. We were before Judge Cadogan, and the defendant filed a motion to transfer for form 9 convenience. I, on the plaintiff's standpoint, and certainly it's in the briefs and it's before the court in the record, we were pushing to conduct various form 9 convenience discovery. I don't think that Mr. Sotera and I disagree about many things. We won't disagree about this. And I put in the brief, ADM wanted to get to the heart of the matter with the motion to transfer. They didn't want to do any discovery and was resisting, which is their right. And ultimately the judge heard the motion and granted the motion to transfer back to Adams County, where my client was from and where the occurrence took place. The standard of review is an abuse of discretion standard. And I would note that it's in the context of what the Supreme Court tells all of us, how we should evaluate these form 9 convenience matters. And what does the Supreme Court say? I would first say, you know, we've had a whole generation of cases that have evolved over time by the Supreme Court. We've had the Gearing case, and then we had Peel v. Skelgas. Then we had the Gearing case, and it kind of evolved over time. We ultimately get to the Dowdy case, which the defendant relies heavily upon. I'd be happy to address that. And then we ultimately get to the Langenhorst, which is, I would suggest, the more seminal case and the most recent case by our Supreme Court. What does the Supreme Court say? The Supreme Court says that in most instances the plaintiff's initial choice of form will prevail, provided venue is proper. And we all agree it is here. And the inconvenience factors attached to such form do not greatly outweigh the plaintiff's substantial right to try the case in the chosen form. And, Justice, before you ask me, I know what you're going to ask. Well, Mr. Bruce, isn't it a no or what's the question when the plaintiff doesn't reside in the county in which they bring the action, right? So that's an issue, and that's raised in the brief. And my response to that, of course, is what Langenhorst tells us from the Supreme Court is it's not no deference. It's less deference when the plaintiff does not reside in that chosen form. But the language the Supreme Court used in Langenhorst was fairly strong about what the defendants – it's the defendants' burden, what they have to show to transfer the matter. And that's what we think is materially lacking here. The plaintiff's form choice should rarely be disturbed unless the other factors strongly favor transfer. So that's the context that we're all here for, right? That's the hurdle that the defense has to establish. So I know that – You guessed my first question, but you're mistaken. My first question is the standard of review, which essentially means that before we can reverse Judge Cadogan, we have to conclude that his decision was unreasonable. How do you meet that on this record? I'm sorry? How do you meet that standard on this record? Certainly. I thought I mentioned it, and if I not, I apologize, Justice. I thought I mentioned the abuse of discretion standard. No, you did. Okay. No, absolutely. There is an abuse of discretion standard, and how do we meet that in this case? Well, just to be clear, I think we view it as being essentially unreasonable. No reasonable person could have adopted this position, so how can we reach that? Justice, I didn't mean to interrupt. Go ahead. You and I agree what the standard is, and I agree with your definition. And that is the definition that I cited in my brief. So the question is, what's the evidence in this case? Justice, as a former clerk and as someone that practiced in appellate court, I am a man of what's in the record. And I know that from reading your opinions, you feel the same way. What's in the record, right? So you know, having read my brief, one of our principal positions is there's a complete dearth, there's a complete lack of competent evidence before this court which would suggest that this matter should have been transferred to Adams County. And you say, what is that? If we start with Langenhorst and we go to Bradbury and we go to Wilton v. Linai Motors, Irwin, Elling, the case law is alleging that it's the defendant's burden. And in the vast majority of these cases, it comes down to competent evidence in the form of affidavits and deposition testimony. Now, how can you get up here and stand up here and say, and make the point, well, does he say that's mandatory? Is that required? I would say this to you, Justice, that they have to have competent evidence in order to make their argument to the court. They have none. It's undisputed and uncontradicted. There's not a single deposition that they have cited to in the record that's before you that suggests that any witness, whether it be an ADM witness or any non-party witness, is inconvenienced by having the case in this county. And moreover, my practice is all catastrophically injured. And we're always filing in Cook County, and they try and transfer out of Cook County. Invariably, invariably, just like in Lange, Morse, and Bradley and all those cases that we've cited, you have this battle of affidavits. Who's more convenient? Who's what's less convenient? That's what you get in these cases. And then we get into an evaluation of the affidavit. Is it conclusory? Did they supply the court with sufficient proof that somebody's going to be inconvenienced? We have none of that here. Does the Supreme Court say that's necessary? No, and that's the question that I anticipated when I was answering Justice Turner. It doesn't say it's required, but as Mr. Cetera correctly points out in his brief, the rule itself talks about affidavits. Let's be clear. 187 talks about affidavits. And you say, well, Devin, does it require it? It does. I will readily emphasize, it's not a litmus test. It's not bullying. It doesn't actually, okay, no affidavit. But what it does say is that they have a substantial burden of proof. And if you look at all these cases that I'm citing to you, and I'd be happy to go through them, and they all talk about affidavits or the lack of affidavits. And they go even further. They talk about the lack of sufficiency of the affidavits. I'm not going to speculate to this court about why ADM did not come up with this whole affidavit. I mean, normally I see five or ten. So, Mr. Bruce, we all agree that affidavits are not required. Not required. And what we're to be looking at are the public interest and those factors, right? That's what we're looking at, and whether or not the court abuses discretion in denying the motion to transfer. Absolutely, Justice. But let's be clear. If they're going to talk about, and if your opinion, whatever it may be, if it's going to be based at all upon the location of the witnesses, you have no evidence that supports theirs, right? I disclosed 213 answers, and I amended them and disclosed them again. Signed, sworn, 213 answers to interrogatories, right? And they list six witnesses in Avon County. They list 11 witnesses. This man lived for three weeks, a few blocks from here. This is my hometown. He was over in the Warnell Hospital, right? He lived here. I disclosed 11 witnesses at trial that were medical physicians, and then the medical examiner that had the cause of death. And before they came, I understand there's a decision out of the Fifth District Court, Shaw, and I think that that's a very interesting decision, because what Langenhorst says, the Illinois Supreme Court told us in Langenhorst, is we look at treating physicians as relevant witnesses in evaluating the factors. That's what the Supreme Court said. So I can't reconcile. I was in counsel on Shaw. I don't know how they came up with that decision. But at the end of the day, what the court said is, in Langenhorst, no affidavits have been filed stating that St. Clair would be an inconvenient forum for any of the witnesses, right? And then they go on to say, defendants ignore important witnesses located in Belleville, St. Clair County, St. Louis, Missouri, Springfield. So in the Langenhorst decision, like the Guerin decision, there were a lot of witnesses located in a lot of different directions, and the Supreme Court has been very clear about that rule of law as well. When they're scattered in all different directions, they don't go to the defendant's place of forum. That is not more convenient. Here we've got two in Texas. We've got one in McHenry County. We've got one in Missouri. The sole eyewitness to this occurrence is in Missouri. The sole eyewitness. So we've got two in Texas, one in McHenry County, one in Missouri. The two ADM employees that filed their answers to interrogatories that had the signs sworn interrogatories from ADM, they're from Macon. Now my uncles, I live in Springfield. My uncles are over in Decatur. I mean, that's 36 minutes away in Decatur. It's not Adams County. So the convenience, the irony of this, is the convenience for the ADM employees, one's in Missouri and two are over in Macon County. So how is it that a substantial, overwhelming majority of the witnesses are, you know, in Adams County, it makes no sense. But back to the case law. Counsel and Justice, you asked me, Justice Turner, about the necessity of the affidavits. I'm just being candid. I'm being intellectually honest. I'm not saying it's mandatory. What I'm saying is what is mandatory, absolutely, we all agree on that, is their tremendous burden of proof. And so that's how lawyers do it. They provide affidavits. And you look at this Bradbury case. In fact, the appellate court said in that case, the record in this case is quite remarkable, and I think this is interesting for this case. Not for what it contains, but rather for what it does not contain. The defendant's form 9 convenience motion was not verified and was not supported by any affidavits. And they continue. That's what the appellate court said in Bradbury. And then they continue to say, other than the obvious convenience to the defendants, if they were to defend the action in their home forum, they have failed to identify any non-party witness from Kankakee County. Neither this court, and I think this is pertinent for our discussions here today, neither this court nor the trial court should be forced to reach a decision by speculating as to the identity, number, and location of witnesses that a party may call to testify. Now, in fairness to Mr. Cetera, and in reviewing this in the weeks leading up to this oral argument, Mr. Bruce, did ADM identify some witnesses in addition to that eyewitness who I understand is from Missouri? What about the people from the Quincy Fire Department, an arson investigator, a Neal Oil Company employee? Justice, you're one step ahead of me. I just was grabbing it. So as I was preparing for this oral argument, I went through Mr. Cetera's brief, and I went to every record site that he provides to this court. Looking at what's in the record, there are four pages that he has cited as to where they identified the witnesses. And for the record, it's 463, 859, 860, and 526. And if you'd like, Your Honor, I have a copy of the record if you would like. No, we get that as well. Right, that's what I thought. But to answer your question, and I just want to be accurate, right? So if we look at what did Mr. Cetera disclose and what was the record before this court in the trial court and before you today, I had asked in an interrogatory for the 213F1 and 2 interrogatories to them, and they responded by objecting, and I sent them to a 1K letter, and Mr. Cetera sent me a letter, and this is what he's citing to as to his identification of witnesses. ADM stands by its objection to this interrogatory, that requesting the names of each witness who will testify at trial is premature. Those are not my words. That's what Mr. Cetera said. It's premature not giving you names and addresses and what they're going to testify to. And then he continues, and then he ultimately says, although we continue to believe this interrogatory is premature, in an effort to resolve discovery disputes with the plaintiff, the following is a list, and I want to quote this because the case law that I want to walk through with you talks about that this is woefully insufficient when they talk about potential possible witnesses, et cetera. The following is a list of potential lay witnesses who may testify at trial, and Mr. Cetera identifies 10 to 12 people, okay? I'm answering your question, Justice White. There's not a single address of any of these individuals' homes. Well, my question was, did they identify six members of the Quincy Fire Department, an arson investigator, and a Neal Oil Company employee? First of all, I can't tell for this, Justice. Okay. So your answer is no to that? My answer is no. They don't identify who the people are. They don't identify their home address. They don't identify their office address. They don't identify their subject of their testimony. And most importantly, and I would ask Mr. Cetera when he stands up here, where do you show that any of these witnesses who are may possibly potential lay witnesses who may testify when he doesn't say anything about them? We don't know where they live. We don't know what their address is. We don't know why he's going to call them at trial. And that runs afoul of all of this case law, and there's no evidence that any of these people would be inconvenienced by coming to Springfield for trial. And, Justice White, I think that's what the crux of all of this case law says. So it's your position that that's required? Absolutely. That's clear. Here, as I'm citing the Wilton decision, here, as in Langenhorst, no affidavits have been filed stating that Madison County would be an inconvenient forum for any of the witnesses. And based on that, they said they didn't meet their burden of proof. In the Irwin v. Motorola case, same thing over and over again. In fact, Motorola has not provided the name, address of a single witness. It intends to call at trial, nor for that matter what, if any, relevant testimonies those witnesses must provide. Since the burden of proof lies with Motorola under these circumstances, we are not at liberty to speculate about a witness's whereabouts or unwillingness to testify at trial. It goes on. The case law is legion. What they're asking you to do without any 213 answers, without any affidavits, with just a letter agreement which talks about here are these people, right? I mean, even look at the other two pages that he cites to you in his brief as to who they're going to call as witnesses at trial. They just vaguely talk about Neal Oil Gas witnesses. They don't tell us. He says, Neal Oil and potentially its customers will be a significant source of testimony and evidence. Who? Where do they live? Why are they inconvenienced to come to Sangamon County? There's a huge burden on him. The record here is not good for them. It's not. And Judge Cadogan didn't expound as to what his reasoning was, which is why I pointed that out. Could we reasonably infer that if someone lived in Adams County, it would be more convenient for them to testify at a trial held in Adams County versus Sangamon County? Justice, that's not the law according to the Supreme Court. I was just a question. No, I mean, look, I'm just... Is your answer is it doesn't make any difference? My answer to the question is, from lang and horse and its progeny, they say the burden's on them, and they've got to show inconvenience. And by saying, well... So we can't make a reasonable inference as justices. I don't think you can. Justice, let's say I went along with you on that. Let's just say, okay... Fine. You make it sound like I'm taking a position. I'm just asking questions. No, but I want to take it another step further. Let's just say for discussion's sake, arguable, that we can make that inference. I would ask Mr. Sotero, when he stands up here, when he has this letter, where is the address for Matt Gibbons, Don Hendry, and Scott Dishon? Where are they identified their home address? Where is it their work address? Where is the subject matter of their testimony? And importantly, according to all this case law that I'm citing to you, where does it say competent evidence? Now, he's going to point to police reports and ambulance reports and say, well, that's in the record. We can just say what that is. I'll tell you, I wouldn't like to go up to the Supreme Court on that argument because this Langenhorst specifically defeated that. The Langenhorst case, it is not sufficient just to throw police reports and ambulance reports and say, well, you got the report. You know where these people live. That's not what the rule of law is. They have a burden, and just throwing a police report, that doesn't tell us where that person lives. That doesn't tell us it's inconvenient for them to go here. Let me go back for a moment, counsel. You mentioned about how, after this terrible injury, the plaintiff suffered, or the deceased suffered, Mr. Pratt. I guess on March 4th, he was brought to the Memorial Medical Center on March 23, and numerous physicians treated him before his death, and how those people would likely justify a trial. Is there any issue about his medical treatment in this particular case? That is— It's not a med mal case. I understand where you're— Yeah. No, it's not a med mal case, if that's the question. So he was treated, and he died after three weeks, and there wasn't much, if anything, they could do for him, I'm assuming. Horrible pain and suffering, multiple surgeries, debridements, a number of surgeons treated him. And I would—to the extent that you're asking, why is that pertinent for our analysis? I would only go and direct you specifically to the Langenhorst decision, where they're evaluating the relative witnesses, and those witnesses include plaintiff's treating physicians, and then they go through this litany from St. Louis, the medical examiner, some St. Louis, from Springfield, and the Supreme Court is telling us, in the Langenhorst decision, we do look at where the treating physicians and the pathologist is when we're making this decision. Were there any issues in that case pertaining to what they were going to be testifying to, like competing medical testimony or disagreeing medical testimony? No, and nor is there in this case. Well, I suspect there isn't in this case, and I want you to remind me about that. Oh, I'm sorry. No, no. In Langenhorst, it was—that was an auto case with a UP driver, if I recall correctly. So, yeah, no, there wasn't—I'm sorry. There's not a med-mal aspect to that case. It's directly analogous to this case. Well, even if it's not med-mal, it's a question about what caused the death, might be some dispute, what else was a contributing factor, et cetera. No, there was not, to answer your question. And there was none of that here either, as far as you know. Is that correct? That's correct. That's correct, Your Honor. Okay. Go ahead. And I guess the input of all of this is that there's two decisions that they're relying upon to say you don't look at the treating physicians. You've got this aberration down there, this Shaw case, which I would suggest it's an appellate court that runs afoul to the Supreme Court decision for the reason I just told you. I don't know how they get around that, where the Supreme Court's telling us you look at treating physicians and the pathologists. And then the other issue is—the other issue is—case is the Enterprise car case, the Conn v. Enterprise car case. And in that case, the irony of it is, again, the plaintiff was the person at issue in that case, and the court sitting where you are was very critical of the plaintiff's lawyer for not identifying the name, the address, and the subject matter of the treating physicians in that case. Where here, that's clearly and unambitiously set forth. I mean, the bottom line here is this. There is no competent—oh, sorry. Your time is up. Okay. Thank you, Justice. You'll have an opportunity to address this again. Thank you so much, Justice. Thank you. Okay. Mr. Sitara? I thought we were the same height, but I'm going to lower you. Good afternoon, Your Honors. Again, my name is Frank Sitara, and I'm here on behalf of ADM. Let me start by stating, I mean, we have a very developed record for a motion. In fact, the record now, I think, exceeds 1,000 pages. Obviously, the court has the record. I have it on counsel's table, and you can see the length of the record. But contained in that record are sworn interrogatories, a plethora of information regarding who the witnesses are, where the witnesses are located. So when plaintiff gets up here and says, well, we don't know where the Neal—the Quincy Fire Department employees are, I mean, we identified in the record voluminous records from the Quincy Fire Department showing the six individuals from Quincy who traveled to the scene of the accident immediately following the accident. They were then followed by Lieutenant Alan Thurman Munger, who performed an extensive investigation of the accident scene. That investigation is located at pages 314 and 316 in the record, as I recall. Plaintiff seems to want to suggest that there is a bright line rule, which is contrary to our case law on whether, in fact, the movement is required to come forth with affidavits. And let me start with the Bland decision, which is a Supreme Court decision from 1987. And in Bland, the court stated, the expense to the defendant of transporting witnesses to Madison County and maintaining them is obvious, as is the greater inconvenience to the witnesses. So to answer— Well, let me ask you this, Counsel. Sure. You saw Mr. Bruce's argument to us, and he holds up a document with your list of witnesses, and he says there are no addresses identifying these people. If I understand your argument now, you're telling us that's not correct. That is not correct. In fact, there are— You provided for the names that he's presented there. You've otherwise provided addresses for these people? We identified that Mr. Clark, for example, who was the sole eyewitness to the accident, is employed in Adams County and resides across the border in Missouri. There were, at the request of plaintiff's counsel, we identified the two ADM employees, Mr. Whitlock, and I'll give you the name of the other— Well, let me be more specific, because my understanding correct of what you're telling us is, notwithstanding the document Mr. Bruce flashed at us with this, that that's not the only reference to the people in this case, who you may be testifying as witnesses, that you have otherwise identified their location as being in Quincy, and that that was presented to Judge Kattegat? It was. We presented— Can you tell me where and how? Yes, we presented the counties in which they reside. I don't know that we provided street addresses, but we certainly provided counties. In what document and how? Sure. In the response to amended answers to ADM's interrogatories at record sites 719 through 733. I'm sorry. Actually, those are plaintiff's interrogatories, which are important, because plaintiff identified Stephen Clark, Don Hendry, and Scott Trent as trial witnesses. So by plaintiff's own concession, he identified these three individuals. With respect to— Yes. Okay. Go ahead. With respect to the individuals that I was just identifying— By the way, pausing right there, are those four people whose names are on the list that Mr. Bruce was just showing you? Yes. Okay. Go ahead. At record sites 490 to 493, we indicated Stephen Clark, who is the sole eyewitness, who we've identified at least a half dozen times that he works. He's a maintenance worker at the Quincy facility who lives in Missouri. Where is where? Missouri, across the border, just across the river. Stephen Clark connected a high-capacity water pump and lubrication hose to the subject diesel tank. Mike Whitland, an ADM employee at the direction of Steve Epperson, an electrical superintendent, connected an electric motor to the pump. Mr. Whitland and Mr. Epperson both reside in Adams County. So all three— Let me just change my question then. Are you familiar with the document that Mr. Bruce says you provided him that had the list of names without addresses? Yes. I think that was a letter that was an attempt to resolve a discovery dispute. But it's not the only— So you are now representing that all of that information he had, as far as their addresses, and you presented that to Judge Categor? Yes. Okay. Go ahead. I think the record is filled with references to each of the witnesses, all of whom— So, Lieutenant Munger comes out to the scene immediately after. So he's the fire and arson investigator. Now, six representatives of the Quincy Fire Department are immediately dispatched to the scene. They each spend well over an hour at the scene. They then call Lieutenant Alan Thurman Munger, who arrives at the scene and performs a thorough investigation of the scene. So all seven of those individuals from the Quincy Fire Department perform an initial investigation. They also perform the initial care and transport of Mr. Pratt to the hospital. Now, what does Lieutenant Munger do? He then interviews Don Hendrian, who's the director of safety at the Quincy facility, also an Adams County employee and resident, and Scott Trent, an employee from Neil Oil, also an Adams County resident and employee. Are there any witnesses who will be testifying in this case, as far as it now stands, who are from Adams County other than the medical personnel from Memorial Medical Center? Well, obviously Mr. Clark, although he works in Adams County as a Missouri resident, Mr. Plaintiffs identified a transport helicopter, or I don't know if it's a plane or a helicopter, the pilot who transported Mr. Pratt from Quincy to Springfield. That individual is a Missouri resident. I think if you eliminated the treating physicians at Memorial Hospital, this is not even a—I don't even think we're arguing about this. Well, are there anyone besides medical personnel who would be testifying in this case who aren't from—I'll change it, make it more positive—who are from Segment County? Anyone besides medical personnel? Not from Segment County, no. Is there any medical issue that's challenging, contesting this case? No, absolutely not. In fact, I think we stipulated on the record that cause of death is not going to be an issue in this case. So are there any witnesses from Macon County that will be testifying? ADM? Yeah, well, I think there was one individual who subsequently, I think, took part in the Osher investigation. He was not on the scene at the day of the accident. He was not—obviously not a witness to the accident. So, I mean, this is an overwhelmingly localized dispute in Adams County. Counsel, I'm going to digress just a second. On the fact sheet, Neal Oil Company is designated as an Apple lead. Do they have any say in this at all? Well, Neal Oil's counsel is here. We filed a third-party complaint against Neal Oil and have identified a number of witnesses from Neal Oil. Am I to understand they could have filed a brief but just haven't done so, which is okay? Yeah, they chose not to do so. I'm not privy to their motives for doing so. I think the record— Now, several minutes ago, you were talking about something. You used the word logical, and you were referring to a case. I forgot the name of it now. Bland. Yeah. Would you go back to that because I thought you were going to address a question that I had raised. Maybe I'm wrong, but would you pick up your place where you were? Yeah, I was trying to answer the question you raised, Justice Turner, about whether you can presume that individuals from Adams County would be inconvenienced. I think I said infer, but okay. Infer. Infer is a much better word. And what the Supreme Court in the Bland decision said was the expense to the defendant of transporting witnesses to Madison County and maintaining them is obvious, as is the greater inconvenience to the witnesses. So that's our Supreme Court. Now, I know that plaintiff wants to focus on Langenhorst at the expense of Doughty, but Doughty was very clear—in fact, Justice Kilbride's dissent makes clear that there were no affidavits filed in Doughty, and yet the Supreme Court reversed both the trial court and the appellate court and concluded that the matter should be transferred. So there is no bright line that affidavits are required or not required. In fact, there was some discussion of Rule 187. Well, they weren't heard to be, so how come we don't have any? Well, let's look at who the witnesses are, and we can explain why. I mean, first of all, I mean, the elephant in the room, and Mr. Woodworth is present in court, is prior to the case being filed, plaintiff sends a letter to ADM with a draft complaint in which they acknowledge in the draft complaint that Adams County would be the most—and I'm quoting— Adams County would be the most appropriate and convenient forum for witnesses and evidence. Now, at the argument on the forum motion, Mr. Bruce stood up for the very first time and said, well, that's a Rule 408 settlement communication. I argued, no, it's not being offered for the purposes of liability. It's just being offered as an attorney for the Pratt family as an officer of the court, as an agent of Mrs. Pratt, sends a letter to ADM with a draft complaint conceding that Adams County is the most appropriate and convenient forum for witnesses and evidence. So having that in our quiver, or I guess having that in the record, it certainly strikes me that we have a concession from plaintiff that Adams County is indeed where the case should have been filed, and in fact, the draft complaint had an Adams County caption. So that was the— Why does plaintiff want this case trialed in Sanford County? I don't know. I know certainly that— You've got some rationale for it. I— For the convenience of the physicians? Well, that—you know, whether there's some sort of forum shopping going on. I mean, I think clearly the court statistics demonstrate that Adams County is far less congested. In fact, the statistics show that at the end of 2017, there were only 12 cases pending in Adams County with a jury verdict of 50,000 or more. And the court can take certainly judicial notice that the 2018 statistics, which came out after the briefing, was done was similar. So are you actually going into the public and private interest factors? Yes, yes. Okay. And so I don't know a perception that the juries may be more sympathetic in Sangamon County. I don't know, but this is— Are there statistics that show that? Do you know any? I mean, I've certainly looked at jury verdicts, but it's not—I would say it's all anecdotal. Let me ask this. Should this court even consider that anyway, or is that an improper consideration? I don't think there's a sufficient record to suggest that there's forum shopping going on. But what we do know is the estate was opened in Adams County to suggest that members of the Quincy Fire Department, who performed a significant investigation, transported Mr. Pratt to the hospital, cared for him during that crucial period of time, should be required to come to Sangamon. As public servants in Quincy, I find it remarkable to suggest that there would be no inconvenience, both to the people of Quincy, to take public servant firefighters out of Quincy to come to Sangamon. And we all know what trials are like. I mean, you could spend a half day waiting in the hall. I've had people wait the entire day in the hall and have to come back the next day. If the trial were held in Adams County, the fire department members would be a phone call away and could be there in five or ten minutes. The same is true of Mr. Clark, Mr. Hendrian, Mr. Whitlin, all the individuals at ADM who not only connected the apparatus that was involved, but Mr. Clark is the sole witness to the accident. Moreover, there's certainly a dispute in the briefing as to whether a site inspection would be or wouldn't be appropriate. That's something for the trial court to decide, not certainly for this court to decide. But let me just talk briefly about a site visit. First of all... We do have to, it's appropriate for us to consider that in terms of the ability. Sure, of course, the ability. And certainly the ability would be far more easy were the case to be held in Adams County. Now, plaintiffs in their briefs suggested, well, the site has changed. What has changed about the site is the underground tank has been removed. But that tank wouldn't have been visible the day after the accident. But what is in the record, and the photographs demonstrate that are in the record, are the bulky equipment that is being stored at ADM presently. And in fact, as the record makes clear, the first thing plaintiffs did after filing the complaint was to seek a preservation order and an inspection of that equipment. And in fact, prior to the lawsuit being filed, there were three inspections. So suddenly, we're now to believe that it's unimportant that a site inspection or a review of this bulky equipment is needed. And I think that is belied by the record. I mean, there were three inspections prior to the lawsuit being filed. There was a motion to preserve evidence that was filed. The record shows the pump, the electric motor, the nozzle that was being used. All of that is being stored in Adams County and was so important that plaintiffs, before we even appeared in the case, filed a motion in Sangamon County to preserve that evidence and to perform an inspection. So all of that equipment by plaintiff's own concession is important and central to the case. Now, to suggest that ADM should be required to transport this bulky apparatus, an electric motor, a pump, a nozzle, to Sangamon County is, again, belied by plaintiff's own motion to preserve that evidence and to inspect it, not in Sangamon County, but to inspect it in Adams County. Similarly, before Neil Oil was named as a third-party plaintiff, who did plaintiff, a third-party defendant, who did plaintiff seek to subpoena? He sought to subpoena Scott Trent and Mr. Neil. And where did he serve that subpoena? And where did he seek to depose those people but Adams County? I mean, this is clearly a localized controversy apart from the physicians at Memorial Hospital. And as we point out in the record and in the case law, the likelihood that 11 physicians are going to testify live at trial, I think, is almost nonexistent. Clearly, our rules provide for evidence depositions of physicians. I think the case law, certainly, both from the Supreme Court and our appellate courts, counsel against putting too much weight on the location of treating physicians, particularly in a case such as this where it's not a medical malpractice case. The care and treatment that Mr. Pratt received is not going to be an issue in the case, or certainly the cause of death is not going to be an issue in the case. And, in fact, the doctor who made the decision, who initially saw Mr. Pratt, Dr. Eckersley, and made the decision to transfer Mr. Pratt to Memorial Hospital, where is he located? Adams County. And the court can certainly see from the record that, again, all of the public servants who attended to Mr. Pratt after the accident are in Adams County. Unless there's any other questions, I will not proceed. Thank you very much. Mr. Bruce, any rebuttals there? Okay. Justice, I don't know how clearly, much more I can put it. You asked the direct question, which I raise in my briefs of Mr. Sotera, where in this record does he identify the witnesses, the addresses, what they're going to testify. It's not there. You asked the question three times. It's not there. It is fundamentally not there. And the Supreme Court, I'm sorry if I keep, I was criticized by Mr. Sotera for keeping my eye on it. That's the most recent form not to be used. So the question I asked about whether the addresses have been provided about the names of the people on that list, do they appear in this record anywhere? And the answer is no. The answer is, Justice, they appear when I'm identifying answers to interrogatories about trial witnesses. The point of this is they have the burden of telling us, the court, who they're going to call at trial, what they're going to testify to, and is it inconvenient for them to come. Well, these are all multiple questions. The first question I'm interested in is, with regard to the list of people you showed us, was Judge Cadogan provided in this record anywhere with where they lived, and were you either because you're the source or because you got it from Mr. Sotera? There's a handful of witnesses that are in Adams County that I put the addresses down and put in my answers to interrogatories. Why doesn't that count? It doesn't count, Justice, because that's not saying that, taking into consideration all the trial witnesses. All the other people that he, you know, blanket lists, there's no addresses to all of those. That's just a complete bold-faced untruth. There is not in this, in 463 of where he identifies, he keeps going back to it as a brief. All of those people's addresses aren't there, and he can't point you to who they're, what they're going to testify to. I mean, the Supreme Court states that exactly what he did, finally defendants have listed, which is exactly what he did here, ambulance personnel, hospital personnel, firefighters, and auto body repair personnel from Clinton County as potential witnesses. He uses that word in his letter, and the Supreme Court says, but have not identified who these people are, where they live, or what, if any, relevant testimony they might provide. That's, I mean, that is absolutely on all fours with what he has done here. Throw it out here, you guys find it in the record, and if we can find somebody that has some semblance to Adams County. That is not their, they have not met their burden of proof. All of this discussion that I just got through hearing about what this doctor did, and what that doctor did, and transferring, none of that is in the record. None of that is disclosed as a 213F3. None of that has been disclosed to them about who, that's just Mr. Saterra talking. I want to be clear on this, because, you know, we are confined by the records, and competent evidence, he doesn't have any competent evidence. This issue about the nozzle and the hose, I mean, I don't know where to begin. He said, oh, well, it's going to be hard to bring it up here. Where is that in the record? It's a gas, OSHA cited them at nausea, huge serious violations, and the crux of the OSHA violations to ADM was this, it's like a gas pump that they created for this. They gave it to my client to use, and a hose. That's the crux of this. That's what OSHA cited them for. It's like a gas nozzle and a hose that you could put in a box that I could put in my briefcase, okay? He's saying, oh, it's inconvenient. If that's his argument, where is that, where's the affidavit? Where's the affidavit from somebody at the ADM that says it's too hard, you can't come up here and do that? He's talking about, well, you know, it's inconvenient for these people coming from Adams County. I just sat here and heard him say that. The whole crux of all this case law is he's got to have an affidavit that says that from each of these people, and then we examine the evidence. He's got nothing. What about, I mean, this is shocking to me. It's just a general discussion about all this. To answer your question, you asked a good question, Justice, about what other people were here. No, Justice Turner, I'm sorry, I think it was you. What other people were in Springfield, you know, outside of Adams County. There are a number of witnesses, which I put in our answers to interrogatories. We've got two trial experts in Texas. I've got a trial expert in McHenry County. And they have disclosed, let's be clear about this, they have disclosed in answers to interrogatories, who's going to testify, the people that signed their answers to interrogatories, the people that signed on behalf of ADM. They're both quality safety people, and they're both in Macon County. So there's all kinds of witnesses. This is Geeran all over again. The witnesses are everywhere, including my doctor physicians, right? He wants me to just accept that it's inconvenient for Adams County people to come here, but it's not inconvenient for me to take my treating physicians that treated this man for three weeks in the medical center to Adams County. I mean, you can't have your, you know, which way is it, right? It's our choice of form, right? It's our choice of form. They have the burden. Neil Oil Company witnesses, he was talking to you about that. He hasn't disclosed any. There's no disclosure of any. There's none in my answers to interrogatories. There's nothing in this record for Neil Oil. Thank you very much. I appreciate your time. Thank you, counsel. I'll take this man under advisement and recess for a little bit.